FILED
2015 Feb-17  AM 11:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **ALETHEA FAYE JAMES,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:13-CV-02148-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On June 14, 2010, the claimant, Alethea James, protectively applied for disability

insurance benefits under Title II of the Social Security Act. (R. 166-75). The claimant initially

alleged disability commencing on December 1, 2007 because of rheumatoid arthritis,

osteoarthritis, hypertension, and reflux. (R. 173, 177). The claimant later amended her alleged

onset date to December 1, 2008. (R. 64). The Commissioner denied the claim on October 1,

2010. (R. 56-58). The claimant filed a timely request for a hearing before an Administrative Law

Judge, and the ALJ held a hearing on April 11, 2012. (R. 32, 54).

In a decision dated April 24, 2012, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R.

20-27). On September 24, 2013, the Appeals Council denied the claimant's request for review.

1

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.   whether the ALJ properly assessed the claimant's credibility and subjective complaints;

2.   whether the ALJ accorded proper weight to the opinions of the claimant's treating and consultative physicians; and

3.   whether the ALJ erred in failing to recontact the claimant's treating and consultative physicians.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*"  Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a

2

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42

U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the
> economy?
>
> An affirmative answer to any of the above questions leads either to
> the next question, or, on steps three and five, to a finding of
> disability.  A negative answer to any question, other than step
> three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider

whether the claimant demonstrated an underlying medical condition, and *either* (1) objective

medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2)

that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of

disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must

articulate explicit and adequate reasons for that decision; failure to articulate reasons for

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

discrediting claimant's testimony requires that the court accept the claimant's testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Id.* at 1562.

Furthermore, the ALJ must state with particularity the weight he gave different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). If the ALJ articulates specific reasons for failing to give the opinion of a treating physician controlling weight and substantial evidence supports those reasons, the ALJ does not commit reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

Additionally, the ALJ has a duty to fully and fairly develop the record. *See Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990). Under the current law, the ALJ is not obligated to recontact physicians if he finds the evidence to be inadequate. This action is now discretionary. *See* 20 C.F.R. § 404.1520b(c)(1) (stating that the ALJ "*may* [not must] recontact your treating physician, psychologist, or other medical source" to resolve inconsistencies or insufficiencies in the record) (emphasis added).

## V. FACTS

The claimant was 56 years old at the time of the ALJ's final decision. (R. 36). The

claimant has a college education and past relevant work for the State of Alabama as a social worker and an intake worker. (R. 37, 45). The claimant also worked as a ticket-seller and a substitute teacher on a part-time basis; however, these positions did not amount to substantial gainful activity. (R. 22, 37-39, 49). The claimant alleges disability based on rheumatoid and osteoarthritis, hypertension, and reflux. (R. 177).

*Physical Impairments*

From 2005 to 2012, the claimant regularly visited Dr. J. W. Pitts at Acipco Medical Group for treatment of her impairments. (R. 244-313). On May 5, 2005, Dr. Pitts noted that the claimant had a history of GERD (gastroesophageal reflux disease), hypertension, and obesity. Dr. Pitts reported that the claimant weighed 248 pounds at this visit. (R. 256). The claimant visited Dr. Pitts's office for treatment of these conditions multiple times throughout 2005, 2006, and 2007. In 2007, Dr. Pitts diagnosed the claimant with fatty liver disease. (R. 250, 287).

On February 19, 2008, the claimant first complained of bilateral knee pain. The claimant stated to Dr. Pitts that "she had to stop walking which she was doing regularly for weight loss because the knees were beginning to bother her." At this visit, Dr. Pitts prescribed Nabumetone, a non-steroidal anti-inflammatory drug, for her knee pain, but the claimant said this medicine was ineffective. Dr. Pitts noted that the claimant was also taking Omeprazole for her gastroesophageal reflux and Atacand for her high blood pressure. Dr. Pitts recommended that the claimant engage in exercises that would minimally impact her knees, such as using the ellipticycle or doing water aerobics.

The claimant visited or spoke to Dr. Pitts regarding her treatment seven more times in 2008. On April 8, 2008, Dr. Pitts indicated that the claimant had been using Salicylate, another

6

non-steroidal anti-inflammatory drug, and had found some relief from this medication. The record does not indicate who prescribed this medication. Dr. Pitts noted that even with the use of this medication, the claimant continued to assert problems with stiffness and pain, particularly when sitting for long periods of time and then trying to stand or walk. (R. 249).

On June 6, 2008, Dr. Pitts noted that the claimant had tricompartmental degenerative arthritis, as well as crepitus, in both knees. Dr. Pitts noted that the claimant's hypertension and reflux were well-controlled. In response to the claimant's continued complaints of pain in her knees, Dr. Pitts prescribed the claimant Synvisc, an injection that supplements the fluid in the knee to help lubricate and cushion the joint to provide osteoarthritis knee pain relief. The claimant received a series of Synvisc and corticosteroid injections over her next several visits to Dr. Pitts's office in 2008. On September 23, 2008, Dr. Pitts prescribed Meloxicam, a non-steroidal anti-inflammatory drug used for the treatment of osteoarthritis and rheumatoid arthritis. Dr. Pitts noted that the claimant wondered if physical therapy might help her condition. On February 2, 2009, the claimant reported to Dr. Pitts that "her knees just simply have not done any better." Dr. Pitts noted that the Synvisc and cortisone injections did not help the claimant's pain. Dr. Pitts also stated that "osteoarthritis is a real big problem." (R. 246-48).

At the referral of Dr. Pitts, the claimant began seeing rheumatologist Dr. Prameela Goli on May 27, 2009. Dr. Goli found that the claimant had a positive rheumatoid factor and an elevated sedimentation rate. Dr. Goli also noted that the claimant complained of pain in both her hands. At this visit, an MRI revealed that the claimant had multiple compartmental degenerative changes. Dr. Goli prescribed the claimant Ultram and Robaxin for her pain, as well as Voltaren Gel, a non-steroidal anti-inflammatory drug used for the relief of joint pain of osteoarthritis in the

7

knees, ankles, feet, elbows, wrists, and hands. (R. 307, 319).

In consultation with Dr. Pitts and Dr. Goli, the claimant also began seeing Dr. Gregg K. Carr at Southern Orthopaedic Specialists. On July 1, 2009, Dr. Carr performed an arthroscopic surgery on the claimant's right knee. (R. 236-38, 530-32). On July 15, 2009, the claimant reported at least 75% symptomatic improvement following the surgery. However, the claimant soon began to experience degenerative changes in her left knee. On August 12, 2009, the claimant reported that her left knee felt much like her right knee felt prior to the surgical intervention. (R. 527-28).

In September 2009, the claimant's physicians diagnosed her with rheumatoid arthritis.[2] (R. 304, 317). Dr. Goli referred the claimant to Dr. Khaleel K. Ashraf at Hematology & Oncology Associates of Alabama for evaluation of her elevated erythrocyte sedimentation rates and thrombocytosis. The claimant visited Dr. Ashraf on December 17, 2009 and January 13, 2010. On January 13, Dr. Ashraf noted that the claimant's rheumatoid symptoms had improved and stated that he hoped once her rheumatoid arthritis was under control, her ESR levels would go down as well. (R. 302-06).

The claimant began attending physical therapy sessions at Therapy South in Pinson, AL in March 2010.  The claimant attended therapy sessions for around two hours, twice a week, from March 2 to April 22, 2010.  On April 22, the claimant stated that her knees were "50%

---

[2] The claimant's medical records do not indicate which physician diagnosed the claimant with rheumatoid arthritis. In a December 2009 visit, Dr. Ashraf noted that the claimant had "[r]heumatoid arthritis diagnosed three months ago." (R. 304). On September 29, 2009, three months earlier, Dr. Goli's mentioned "RA" in her assessment of the claimant, but the notes accompanying this abbreviation are illegible. (R. 317). Dr. Goli, therefore, apparently diagnosed the claimant with rheumatoid arthritis on or around this visit; however, the specific details of this diagnosis are unclear because of the illegibility of Dr. Goli's records.

better since starting therapy." (R. 346-365).

The claimant's therapists at Therapy South referred her to Dr. David P. Adkison for an arthroscopy of her left knee. On May 4, 2010, Dr. Adkison noted that the claimant had left knee pain and stiffness secondary to rheumatoid arthritis. Dr. Adkison further noted that the claimant had severe joint destruction in both knees. Dr. Adkison noted that the claimant had previously experienced good results with an arthroscopy of her right knee. Consequently, he concluded that, even though he would not normally do an arthroscopy in the advanced state of her disease, he thought it would be okay to proceed in that direction given her past success with the procedure. On the day of the surgery, May 10, 2010, Dr. Adkison noted that the claimant had left knee rheumatoid arthritis with advanced degenerative joint disease. During surgery, Dr. Adkison found that the claimant had tricompartmental degenerative joint disease more consistent with osteoarthritis than rheumatoid; a locked bucket-handle tear of the lateral meniscus; an absent ACL; and extensive synovitis medially, laterally, and superiorly. On May 25, 2010, Dr. Adkison noted that the claimant was "doing absolutely great" and showed "definite improvement in her pain from pre op status." On June 24, 2010, Dr. Adkison noted that claimant's range of motion had dramatically improved. (366-69, 537-40).

Following her second arthroscopic surgery, the claimant continued to attend physical therapy at Therapy South in Pinson, AL. The claimant attended therapy three times a week from May 12 to July 9, 2010. (R. 370-400). From July 21 to September 2, 2010, the claimant attended physical therapy twice a week. (R. 541-544). On September 2, 2010, the claimant's physical therapist (signature illegible) noted that the claimant continued to exhibit difficulty in distance walking and going up and down stairs. (R. 542).

9

The claimant completed a function report on July 14, 2010. In this self-assessment, the claimant indicated that she was capable of showering, dressing herself, and preparing a light breakfast and sandwich for lunch. The claimant also stated that she did light cleaning, such as vacuuming and using the dust mop, on the level where her bedroom is, but was physically unable to climb the steps to clean the upstairs bedrooms and bathrooms. The claimant indicated that vacuuming and dusting take her a great deal of time because her gait is unsteady and her knees are stiff. The claimant also stated that she does laundry every other week, and cooks on her "good day[s]." She indicated that most of her day is spent in the recliner or lying in bed. She also stated that she could not take baths because she was no longer able to bend her knees to get into the bathtub. The claimant indicated that she drives her elderly parents to the doctor's office and to go grocery shopping. She also stated that she takes care of her daughter's dog when she is away. Her hobbies were reading and watching tv and that she attends church weekly, sings in the choir at church, and goes out to eat with her friends and family twice a month. (R. 196-203).

On September 9, 2010, Dr. Christopher J. Douglas performed a consultative examination on the claimant at the request of the Disability Determination Service. Dr. Douglas noted that the claimant had bilateral knee crepitus, but also stated that her muscles were a 5/5 in all muscle groups and that she had normal hand strength and dexterity. Dr. Douglas concluded that the claimant could stand or walk for six hours of an eight-hour work day with frequent breaks; could sit for eight hours without frequent breaks; should not lift more than ten pounds; and could ambulate with an assistive device. (R. 417-21).

On October 10, 2010, State examiner Dr. Richard Whitney completed a physical residual

functional capacity assessment on the claimant. Dr. Whitney did not examine the claimant in person, but completed this assessment based on the entirety of the claimant's medical records. Dr. Whitney concluded that the claimant could occasionally climb, stoop, kneel, crouch, or crawl, but could never balance. Dr. Whitney reported that the claimant could occasionally lift and carry up to twenty pounds and could frequently lift and carry up to ten pounds, which would constitute work at the light level of exertion; could stand or walk for six hours of an eight-hour work day; could sit with normal breaks for six hours of an eight-hour work day; and could push or pull, including operating hand or foot controls, without limitation. Dr. Whitney further stated that the claimant should avoid concentrated exposure to extreme cold and should avoid all exposure to hazards such as machinery and heights. (R. 422-30).

The claimant's treating physician, Dr. Pitts, referred the claimant to Dr. Alan Paul at Rheumatology Associates for continued treatment of her rheumatoid arthritis. The claimant first visited Dr. Paul on March 8, 2011. At this visit, Dr. Paul noted that the claimant had a history of knee pain. Dr. Paul reported that the claimant's pain was only in her knees and that she denied involvement of her hands, elbows, shoulders, feet, or ankles. Dr. Paul noted significant joint space loss in both lateral tibiofemoral compartments and both medial tibiofemoral compartments. Additionally, Dr. Paul noted hypertrophic change laterally bilaterally in her knees and extensive hypertrophic changes of the patellofemoral joint consistent with osteoarthritis more prominent on the right. The claimant also visited Dr. Paul's office on June 9, September 6, and November 30, 2011. On November 30, Dr. Paul stated that the claimant had "done well since her last visit" and did not have any significant interval increase in her arthritic symptoms. (R. 433-44).

On March 2, 2012, at the request of the claimant's attorney, the claimant's treating

11

physician, Dr. J. W. Pitts, completed an evaluation of the claimant's physical capacities. This assessment required Dr. Pitts to check the box or circle the option most closely aligned with the claimant's abilities. Dr. Pitts indicated that the claimant could lift five pounds or less; could sit for one hour of an eight hour work day; could stand for zero hours of an eight hour workday; and did not require an assistive device to ambulate. Dr. Pitts also indicated that the claimant could never push or pull; could never climb; could never complete activities involving gross manipulation or fine manipulation; could never bend, stoop, or reach; but could operate a motor vehicle. (R. 624).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ. (R. 32, 54). At the hearing, the claimant testified that she had a part-time job selling tickets. She stated that she worked on average about three days a week, anywhere from four to six hours per day. During and after work, the claimant testified that she experiences constant fatigue and knee pain. After work, the claimant testified that she needs to go to bed. (R. 37-38).

In addition to working a part-time job, the claimant testified that she tries to attend water aerobics class, as recommended by her therapist, for an hour at a time, three times a week. The claimant testified that some days she needs to use her cane for support when walking and that she needs to take occasional breaks when walking or going up stairs because she is short of breath. Additionally, the claimant testified that when she sits for periods of time longer than five to ten minutes, her legs get stiff, and she has difficulty getting up and walking again. (R. 38-41).

The claimant stated that she was capable of getting herself dressed, attending to her

personal needs, and driving, but that she would have trouble with stiffness if she drove for a long period of time. The claimant further stated that she has trouble sleeping because of the pain and stiffness. (R. 41-42).

The claimant rated her pain on average as a three to five on a scale of zero to ten. The claimant rated her worst days of pain as between a six and seven, and alleged that days with pain at a level of six or seven occur two or three times a week. The claimant testified that her pain does not interfere with activities such as watching televison because she has just "learned how to adjust to it." (R. 43).

The claimant testified that she previously worked as a social worker for the State of Alabama. She stated that she worked for twelve years in an investigative capacity with the Department of Human Resources in Child Abuse and Neglect and then for eight years as an intake worker for the elderly. The claimant testified that the investigative position required her to conduct field work, so she was often on her feet and occasionally would have to lift children. The intake position required the claimant to take phone calls and to be on her feet to deliver cases to workers, but it did not require lifting and carrying. The claimant testified that she retired from this position because her brother was sick and was no longer able to take care of her parents. The claimant stated that she would not be able to return to the social worker position now because it required her to "be very alert, very on your feet, able to get out of the way in a moment's notice." She also testified that she would not be able to do the intake position because gathering information "would require a lot of walking, a lot of having to deal with other social workers, different conferences, court hearings and those kinds of things which I wouldn't be able to do back and forth." (R. 44-47).

13

A vocational expert, Ms. Marcia H. Schulman, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Schulman testified that the claimant's past relevant work was as an intake worker, which is classified as sedentary, skilled work. The social worker position would be classified as light because of the field work the claimant did in this position. The ALJ asked Ms. Schulman to assume that the claimant could lift and carry ten pounds occasionally; could sit with normal breaks for six to eight hours; could stand and walk with normal breaks for two of eight hours a day; could push and pull occasionally; could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; and could occasionally crouch, stoop, kneel, and crawl. Ms. Schulman stated that a person with these limitations could perform the intake worker position both as generally performed and as the claimant performed it, but would not be able to perform the investigative worker position. The ALJ asked Ms. Schulman if this individual would be able to perform these jobs if her impairments resulted in her being off task at least 20 percent of the workday. Ms. Schulman replied that the individual would not be able to perform either of the social work positions. Ms. Schulman also stated that the individual would not be capable of performing these positions if her impairments required her to miss two to three days of work a week. (R. 47-51).

*The ALJ's Decision*

On April 24, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 17). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through September 30, 2013 and had not engaged in substantial gainful activity since her amended alleged onset date of December 1, 2008.

Next, the ALJ found that the claimant had the severe impairments of arthritis and obesity.

14

The ALJ noted that the claimant's medical records also indicated a history of hypertension, high blood pressure, and fatty liver disease; however, the ALJ found that the claimant did not allege any substantial limitations resulting from these conditions, and, consequently, these impairments were not severe. (R. 22-23).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for listing 14.09 concerning inflammatory arthritis. To meet this listing, the claimant would have to demonstrate that her arthritis had caused persistent inflammation or deformity of one or more major peripheral joints resulting in the inability to ambulate effectively, perform effective fine and gross movements, involving multiple organs causing certain symptoms, cervical spine fixation with certain complications, or repeated inflammation with marked limitations in the claimant's functional domains. The ALJ determined that based on the claimant's medical history, her arthritis did not cause any of these problems. The ALJ noted that the claimant's ability to walk, perform self-care activities, clean, take care of her daughter's dog, vacuum, and shop further demonstrated her ability to ambulate effectively. (R. 23, 196-203).

Additionally, the ALJ considered whether the claimant met the requirements of Listing 1.02: major dysfunction of a joint characterized by gross anatomical deformity; chronic joint pain and stiffness; and an inability to ambulate effectively or an inability to perform fine and gross motor movements. The ALJ determined that the claimant did not meet these requirements. The ALJ also found that the claimant's obesity had more than a minimal effect on her ability to do basic work activities, but was not so substantial as to meet or equal any of the listings. The ALJ

15

based this determination of the claimant's ability to perform a broad range of daily living activities such as walking, cleaning, taking care of her daughter's dog, vacuuming, shopping, attending church weekly, singing in her church's choir, and eating at restaurants. (R. 24).

Next, the ALJ determined that the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a), such that the claimant could occasionally lift ten pounds; could, with normal breaks, sit six hours of an eight-hour workday; could stand or walk up to two hours of an eight-hour workday; could occasionally push or pull; could ambulate with the support of an assistive device; could occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolding; could occasionally balance, stoop, kneel, crouch, and crawl; and should avoid all exposure to unprotected heights and dangerous machinery. (R. 24).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. The ALJ found that the claimant had greater capabilities than she alleged. Specifically, the claimant alleged that she could perform only limited walking and could lift up to ten pounds, stand up to five minutes, sit up to one hour, and walk up to fifty feet. The claimant testified that she has trouble after sitting for ten minutes, suffers stiffness after driving for 35 minutes, and experiences appreciable arthritic pain but has learned to live with it. The claimant works three to six hours a day, largely in a stationary capacity, and attends church weekly and sings in the choir. The ALJ determined that these activities show that the claimant

16

can sit, stand, and walk for a far greater amount of time than she alleged. Furthermore, the ALJ noted that the claimant retired from her previous job as a social worker because she needed to take care of her parents when her brother became sick, not because of any reason related to a physical impairment. Consequently, the ALJ determined that the claimant's subjective allegations of her symptoms and abilities were not fully credible. (R. 24-25).

The ALJ gave partial weight to the opinions of consultative physician Dr. Christopher Douglas and reviewing physician Dr. Richard Whitney. First, the ALJ gave substantial weight to the opinion of Dr. Douglas that the claimant's abilities were not consistent with a complete inability to work. (R. 25). Dr. Douglas determined that the claimant could stand and walk up to six hours of an eight-hour workday using an assistive device and could sit for eight hours of an eight-hour workday with frequent breaks. (R. 420). The ALJ gave little weight to Dr. Douglas's opinions in that the ALJ interpreted the evidence in a light more favorable to the claimant and determined that the claimant's abilities were less than Dr. Douglas determined. The ALJ concluded that expecting the claimant to be able to stand and walk for six of eight work hours was not reasonable. (R. 25).

The ALJ also gave partial weight to the opinion of State examiner Dr. Richard Whitney. The ALJ gave substantial weight to Dr. Whitney's opinion that the claimant could work with limitations to her abilities to perform postural activities and endure certain environmental conditions. The ALJ found these limitations to be well-supported by the medical evidence. The ALJ gave little weight to Dr. Whitney's finding that the claimant could work at a light level of exertion. The ALJ found that the other medical opinions did not indicate that the claimant could work at this level. Additionally, the claimant's use of a cane, as well as her obesity and arthritis

17

diminish her ability to stand, walk, lift, and carry such as would be necessary at the light exertional level. (R. 25-26).

The ALJ gave little weight to the opinion of the claimant's treating physician, Dr. J. Pitts. Dr. Pitts indicated that the claimant could lift up to five pounds occasionally; could sit up to one hour a day; could never perform activities such as using arm and leg controls; and could never climb stairs, balance, perform gross or fine manipulation, or reach. (R. 621-28). The ALJ gave little weight to this opinion because he found that Dr. Pitts only provided "marks on a form without explanation," and his opinion was "fully unsupported by the evidence of record." Dr. Pitts indicated that the claimant could operate a motor vehicle. The ALJ concluded that this finding was inconsistent with Dr. Pitts's allegation that the claimant could not perform fine or gross manipulations or use arm and leg controls. (R. 26, 621-28). Additionally, the ALJ explained that the claimant's work activity showed that she was capable of sitting for over an hour and capable of standing. The claimant's testimony indicated that she performed light cleaning, washed laundry, shopped, took care of her daughter's dog, and used a vacuum cleaner. The ALJ noted that these activities all demonstrated that the claimant was capable of lifting more than five pounds. (R. 26, 196-198, 621-28). The ALJ similarly gave little weight to Dr. Pitts's finding that the claimant did not require an assistive device to ambulate, as the record did not support this finding. The ALJ acknowledged that Dr. Pitts was the claimant's treating physician, but stated that "even a treating physician's opinion must be well supported and consistent with the other evidence. His opinion is not." (R. 26).

Finally, the ALJ found that the claimant was capable of performing her past relevant work as an intake supervisor. In making this determination, the ALJ relied on the testimony of

18

the vocational expert at the ALJ Hearing. The vocational expert testified that the claimant could

perform her past work as an intake worker, both as it is actually and generally performed, except

that the claimant could not perform her past work as an investigative social worker where the

claimant worked at a light level of exertion. Thus, the ALJ concluded that the claimant was not

disabled as defined under the Social Security Act. (R. 26).

## VI. DISCUSSION

The claimant argues that the ALJ improperly discounted the claimant's subjective

complaints, that the ALJ did not give proper weight to the opinions of the claimant's treating

physician, and that the ALJ should have recontacted the claimant's treating or consultative

physician before making a determination about the claimant's residual functional capacity. To the

contrary, this court finds that substantial evidence supports the ALJ's decision and that the ALJ

applied the appropriate legal standards to his evaluation of the claimant's subjective complaints

and the opinions of her physicians.

*Issue 1: The ALJ's Assessment of the Claimant's Credibility*

The claimant argues that the ALJ did not properly credit her subjective complaints. More

precisely, the claimant argues that the ALJ failed to adequately consider the effects the claimant's

obesity and persistent knee pain had on her physical capabilities. This court finds that the ALJ

properly discredited the claimant's subjective complaints.

A Commissioner evaluating a claimant's pain and other subjective complaints must first

consider whether the claimant demonstrated an underlying medical condition.  *Holt*, 921 F.2d at

1223; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

If the claimant demonstrates an underlying medical condition, the Commissioner must then

determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Id.* Subjective testimony can satisfy the pain standard if the testimony is supported by medical evidence. *Foote*, 67 F.3d at 1561.

The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The reasons articulated for discrediting the claimant's testimony may include the claimant's daily activities. *Harwell*, 735 F.2d at 1293. However, if the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

The ALJ in the present case properly articulated his reasons for discrediting the claimant's pain and characterization of her physical capabilities. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 24). The ALJ relied on the claimant's daily activities as evidence that her physical capabilities were greater than what she had alleged. Specifically, the ALJ relied on the fact that claimant worked three-to-six hours a day, largely in a stationary capacity, and attended church weekly and sang in the choir. The ALJ determined that these activities showed that the claimant's capabilities were greater than she had alleged and that the claimant could sit for longer than an hour or stand for longer than five minutes. (R. 25).

The court finds that substantial evidence supports the ALJ's determination that the claimant's subjective complaints were not fully credible. Consequently, the ALJ properly

discredited the claimant's subjective complaints.

*Issue 2: The ALJ's Assessment of the Treating and Consultative Physicians' Opinions*

The claimant next argues that the ALJ failed to accord proper weight to the opinions of the claimant's treating physician, Dr. Pitts, and her consultative physician, Dr. Douglas. This court finds that the ALJ properly articulated his reasons for discrediting the opinions of both Dr. Pitts and Dr. Douglas, and that substantial evidence supported these reasons.

Absent a showing of good cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). The ALJ may discount a treating physician's report when the report is not accompanied by objective medical evidence or is wholly conclusory. *Crawford,* 363 F.3d at 1159. An ALJ may also discount the opinion of a treating physician when the physician's opinion is "not bolstered by the evidence." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (2004). If the ALJ articulates specific reasons for failing to give the opinion of a treating physician controlling weight and substantial evidence supports those reasons, the ALJ does not commit reversible error. *Moore,* 405 F.3d at 1212.

The ALJ clearly articulated his reasons for discrediting the opinion of the claimant's treating physician, Dr. Pitts. The ALJ gave little weight to Dr. Pitts's opinion because he found that Dr. Pitts simply provided marks on a form without further explanation, which were internally inconsistent, and were unsupported by the evidence on record. Dr. Pitts claimed that the claimant could only lift up to five pounds occasionally, could sit for up to one hour a day, and

could never perform activities such as using arm and leg controls. The ALJ correctly found that these findings conflicted with other evidence in the record, such as the claimant's work activity, ability to drive, clean, and care for her daughter's dog. (R. 26).

The ALJ explicitly detailed his reasons for finding that the evidence on record did not bolster Dr. Pitts's opinion, and substantial evidence supported these reasons. Thus, this court finds that the ALJ did not commit reversible error in failing to give substantial weight to Dr. Pitts's opinion.

The claimant also contends that the ALJ erred in discounting the opinion of consultative examiner Dr. Christopher Douglas. With the exception of the frequency of breaks the claimant needed to take, the ALJ viewed Dr. Douglas's opinion in a light more favorable to the claimant and determined that her abilities were less than what Dr. Douglas had determined. The ALJ found that Dr. Douglas's assessment of the claimant's abilities was not fully consistent with the record because expecting the claimant to stand and walk for six of eight work hours was not reasonable. The ALJ was not bound to accept Dr. Douglas's findings on either the number of hours the claimant could work or the frequency with which the claimant must take breaks because as a consultative physician, Dr. Douglas's opinion was not entitled to a heightened level of deference. The ALJ articulated the weight he gave to Dr. Douglas's findings and considered all of the evidence in forming his conclusions on the dispositive issues of the claimant's residual functional capacity and ability to return to her past relevant work. Because the ALJ articulated his reasons for discounting the opinions of both Dr. Pitts and Dr. Douglas and because these reasons were supported by substantial evidence, the ALJ did not commit reversible error in failing to afford these opinions full weight.

*Issue 3: The ALJ's Failure to Recontact the Claimant's Physicians*

Finally, the claimant argues that the ALJ should have contacted either the consultative or treating source for clarification of his opinion before formulating his final decision regarding the claimant's residual functional capacity. The ALJ was not obligated to recontact the claimant's consultative or treating physician, and substantial evidence supported the ALJ's findings on the claimant's residual functional capacity and ability to return to her past relevant work.

The ALJ found that the evidence on record was sufficient to enable him to make a determination about the claimant's ability to work. The ALJ based the claimant's residual functional capacity on her medical records and the aspects of the claimant's and physicians' opinions he found to be credible. He then relied on the testimony of vocational expert Marcia Schulman for his finding that the claimant could perform her past work as an intake worker. The ALJ was not obligated to recontact physicians whose opinions were inconsistent with the record or seek any further medical consultation because substantial evidence in the record supported the ALJ's determination. The Social Security regulations provide that the ALJ "*may* [not must] recontact your treating physician, psychologist, or other medical source" to resolve inconsistencies or insufficiencies in the record. 20 C.F.R. § 404.1520b(c)(1) (emphasis added). As such, the ALJ did not err in failing to recontact the claimant's treating or consultative physician.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

23

DONE and ORDERED this 17th day of February, 2015.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE